IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JEFF CHEEK,                           )
                                      )
                    Plaintiff         )
                                      )
        vs.                           )    CASE NO. CV00-HGD-0659-S
                                      )
BORAL BRICKS, INC.,                   )
                                      )
                    Defendant         )

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the motion for
summary judgment filed by defendant, Boral Bricks, Inc. (Boral) [Doc. #8].
Defendant seeks summary judgment in its favor with respect to all claims
asserted in this action by plaintiff, Jeff Cheek.


## The Complaint

Plaintiff filed his complaint on March 14, 2000, alleging causes of action
pursuant to the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601, *et
seq.* Cheek alleges that Boral, his former employer, denied him 12 weeks of
unpaid leave under the FMLA for a serious medical condition (Count I), denied
him intermittent leave under the FMLA for treatment visits to medical care
providers (Count II), and discharged him in retaliation for attempting to
exercise his rights under the FMLA (Count III).

## **The Motion for Summary Judgment**

Defendant bases its motion for summary judgment on assertions that (1) plaintiff did not qualify for FMLA leave; (2) plaintiff never requested FMLA leave of 12 weeks; (3) plaintiff never requested intermittent leave under the FMLA; (4) defendant never denied plaintiff time off for an FMLA-qualifying reason; (5) defendant never denied plaintiff intermittent FMLA leave to go to medical appointments; (6) plaintiff would have been discharged anyway; and (7) plaintiff was not discharged in retaliation because he did not exercise any FMLA rights, and he was terminated for legitimate, non-discriminatory reasons that were not pretextual.

Plaintiff avers, in response, that genuine issues of material fact preclude summary judgment on either the FMLA or the retaliation claim.  He contends that defendant interfered with his FMLA rights by discouraging him from exercising his rights.  Plaintiff argues that when informed of the possibility plaintiff might have to undergo back surgery, Berlingeri tried to discourage plaintiff by stating it would necessitate time off from work and that plaintiff was too young to have such surgery that might worsen his condition rather than improve it.  Plaintiff further argues that Berlingeri was responsible for his termination, thus permanently preventing plaintiff from exercising FMLA rights with Boral.

2

Plaintiff also asserts that he did not need to give defendant notice of the need for FMLA leave in order to state a valid claim for interference, citing 29 C.F.R. § 825.302(c).  He avers the informing his supervisor about his condition, the need for medication and follow-up appointments, and the potential need for surgery was sufficient.  He also contends that the evidence surrounding his termination and the reason therefor is in dispute, making summary judgment inappropriate.

With regard to the claim of retaliation, plaintiff asserts he has made out a *prima facie* case.  He also claims that the pretextual nature of the decision to terminate him is evident, in that he was not fired for any failure to perform his duties but for attempting to exercise his FMLA rights, or that he at least has raised a factual question as to the existence of pretext.

Defendant, in reply, contests plaintiff's assertion that he requested or was denied FMLA leave.  Instead, defendant asserts that plaintiff only mentioned the possibility that he might have to have surgery in the future, never was denied any requested leave, and did not even have to schedule surgery.  Further, when plaintiff brought up the possibility of being late due to a doctor's appointment, he was told "okay," and when he said he might require surgery, his supervisors said only that he would need to let them know when so that they could arrange for someone to cover plaintiff's shift.  Defendant further contends that any mistake in the run of bricks which allegedly caused plaintiff's

3

termination could have and would have been prevented had he performed his expected duties.

## **Findings of Fact**

Boral is in the business of manufacturing bricks. It operates a plant in Bessemer, Alabama. The plant makes many different colors of bricks, with the number and color of bricks to be produced being set on a daily basis. [Cheek Depo. at 88, 95, 96]. The color of the bricks is determined by the "slurry," a composition of water and color additives. [*Id.* at 94, 95, 96].

Plaintiff began working for Boral's predecessor, Bickerstaff Clay Products, at the Bessemer facility in June 1989. He was hired as a Quality Control Supervisor at Plant 5. [*Id.* at 76-77]. He later became Shipping Supervisor [*id.* at 78] then, after several years, Strapping Supervisor. [*Id.* at 79].

In 1995, Boral purchased the brick manufacturing facility from Bickerstaff. [*Id.* at 77, 81]. Within several months after that, plaintiff became a Forming Supervisor at Plant 5. [*Id.* at 85-86]. As such, he was responsible for ensuring that the bricks made during his shift were the correct color. [*Id.* at 88-89]. Plaintiff was being cross-trained as a supervisor in various areas of the plant. [*Id.* at 87]. About six months later, plaintiff resumed his position as Strapping Supervisor. [*Id.* at 90, 91]. Within approximately a year, Cheek was both Kiln Supervisor and Forming Supervisor at Plant 5. [*Id.* at 91, 92]. As

4

Kiln Supervisor, he monitored and made necessary adjustments to the temperature, draft and gas usage conditions of the kiln.   As Forming Supervisor, plaintiff supervised five persons and was responsible for the bricks being made, including insuring that the color of the bricks was correct. [*Id.* at 93, 94, 95, 98].   During plaintiff's stint as Kiln Supervisor and Forming Supervisor, Robert Maner became plaintiff's supervisor. [*Id.* at 101-02].

In November 1998, Maner gave plaintiff a performance review.  Maner deemed plaintiff's performance below average and recommended that plaintiff improve his ability to stay focused on task, improve his organizational skills, and pay more attention to details, paperwork and time books. [*Id.* at 108-09]. Plaintiff stated he had a poor opinion of Maner and experienced a personality conflict with him. [*Id.* at 102, 103].  After the unfavorable review, plaintiff went back to his position as Shipping Supervisor and, in February 1999, received a requested transfer to Plant 6 as Forming Supervisor. [*Id.* at 111, 112, 129-30].  He began working on first shift, then transferred to second shift, starting at 3:30 p.m., in September or October 1999. [*Id.* at 132, 196].  His duties as Forming Supervisor at Plant 6 essentially mirrored his responsibilities at Plant 5, but there was a more sophisticated paperwork scheme at Plant 6 which required the Forming Supervisor to sign off on every batch of slurry that was made, as well as a supervisor checklist for brick measurements. [*Id.* at 130-31, 132].  The sand and slurry worker is responsible for gathering the

5

materials needed for the slurry and filling out the slurry checklist. [Berlingeri Depo. at 55]. The supervisor is responsible for ensuring the worker has the correct materials and then initialing the paperwork once he has examined the slurry materials. All of these tasks must be done before the slurry is mixed [*Id.*]

At Plant 6, Cheek was supervised by Jose Berlingeri, with whom he had no personality clashes. [Cheek Depo. at 132, 133]. Berlingeri was the Plant Manager of Plant 6 from May 1998 to June 2000. [Berlingeri Depo. at 10-12]. Berlingeri reported to Bill Tudor, Boral's Regional Production Manager. [Cheek Depo. at 133-34]. The Assistant Plant Manager was Curtis Elliot. [*Id.* at 132, 149]. In August 1999, Berlingeri met with all the Plant 6 supervisors regarding a run of about a million bricks that had been improperly manufactured and had to be downgraded. [Cheek Depo. at 134-36; Berlingeri Depo. at 23-24]. At that meeting, all supervisors were warned to pay attention to detail in making the bricks and filling out paperwork and that failure to do so could result in termination. [Cheek Depo. at 136-38].

On January 8, 1999, Cheek suffered an on-the-job back injury. [*Id.* at 112-13, 119-20]. Plaintiff went to the emergency room for treatment, but he did not take any time off work because the plant was trying to win a safety award. [*Id.* at 121-23]. Plaintiff received a bone scan, an MRI, pain medication and muscle relaxers. [*Id.* at 124, 126].

6

On December 27, 1999, plaintiff fell ill with a stomach virus which caused repeated vomiting. [*Id.* at 44-45, 197-98]. The vomiting aggravated Cheek's previous back injury. [*Id.* at 45]. Plaintiff visited the emergency room that day and received Phenergan for nausea, an IV drip to combat dehydration, and two shots of Mepergan for back pain. [*Id.* at 45-46]. Plaintiff worked from Tuesday, December 28, 1999, through the end of that work week. [*Id.* at 199]. When he still experienced back pain, plaintiff went to the emergency room at HealthSouth on New Year's Eve or New Year's Day. He was treated with injections of a muscle relaxer and pain reliever and received prescriptions for Soma, a muscle relaxer, and Tylox, a pain reliever. He also was scheduled for an appointment with Dr. Martin Jones on January 4, 2000. [*Id.* at 47-51].

Dr. Jones diagnosed plaintiff with compression fractures in his spinal column. According to plaintiff's testimony, Dr. Jones advised that the treatment options included rehabilitation, spinal blocks or surgery, depending on the results of an MRI. [*Id.* at 206-07, 210]. Dr. Jones prescribed Lortab, Soma and Celebrex and scheduled an MRI for January 7, 2000, to determine what further treatment recommendations he might make. [*Id.* at 201, 205-06]. Dr. Jones did not place any work restrictions on Cheek. [*Id.* at 209]. After his appointment, plaintiff went into work on January 4 and testified that he met with Curtis Elliot. Plaintiff further testified that he told Elliot the doctor had said he might have to have surgery or a spinal block and that he was

7

taking pain medication which could affect his ability to work. [*Id.* at 149, 210-11]. Elliot told plaintiff to sit in his office and take it easy, and employees could contact plaintiff by radio if he was needed on the floor. [*Id.* at 149-51; 212]. Elliot also told plaintiff to make sure he still performed all required checks. [*Id.* at 151; Elliot Depo. at 32-33]. Cheek did not speak with either Berlingeri or Tudor on January 4. [Cheek Depo. at 213].

On January 5, 2000, plaintiff and Berlingeri discussed the possibility that plaintiff might have to take time off for back surgery. [*Id.* at 214-15; Berlingeri Depo. at 64-65]. Berlingeri told plaintiff to let him know if surgery had to be scheduled so that Berlingeri could get someone to cover for plaintiff. [Berlingeri Depo. at 65]. Berlingeri also expressed his opinion that plaintiff was too young for back surgery and that the surgery might not help him but instead worsen the condition. [Cheek Depo. at 214]. Cheek also told Berlingeri that he might be late for work on January 7, due to the scheduled MRI. [Cheek Depo. at 217]. Berlingeri told plaintiff that would be "okay." [*Id.*]. Cheek had no further discussions with Berlingeri about his back problems, nor did he discuss the matter at all with Bill Tudor. [*Id.* at 217-18].

On January 7, 2000, Cheek had an MRI. [*Id.* at 202]. About a week later, he had an appointment with Dr. Jones to review the results. [*Id.* at 202, 207]. By that time, plaintiff's back pain had subsided, and the doctor suggested he continue with medication, primarily Celebrex. [*Id.* at 207-08].

8

Dr. Jones said a spinal block or surgery would not be necessary due to the abatement of the pain. [*Id.*] Plaintiff saw Dr. Jones once more thereafter and was told that while the back pain might flare up from time to time and that rehabilitation might help, surgery was not recommended. Plaintiff never has had back surgery and had not seen Dr. Jones again by the time of his deposition in this action in October 2000. [*Id.* at 208-09].

On Saturday, January 8, 2000, the day after his MRI, plaintiff was the Forming Supervisor in Plant 6. He spent most of the day in the office. During his shift, a run of 221,760 bricks was made improperly due to a mistake in the slurry mixture. [*Id.* at 138-39, 180, 183-84; Berlingeri Depo. 56-57]. On that day, plaintiff designated Ivory Foster to be the sand and slurry person although Foster was a labor employee and did not usually do such work. [Berlingeri Depo. at 53-54]. As Forming Supervisor, plaintiff was responsible for checking the pallet with the materials for the slurry and initialing the slurry control check list after checking the batches of slurry. [Cheek Depo. at 181-82; Berlingeri Depo. at 55]. However, plaintiff did not check the batches of slurry to ensure they were correct, nor did he sign off on the slurry control sheet. [Cheek Depo. at 139, 143-44, 180, 183, 190-91]. According to his deposition testimony, he failed to carry out his responsibilities because he was "under the influence of narcotics." [*Id.* at 139]. Plaintiff spent most of that work day in the office, but plaintiff did see Berlingeri and advise him he was leaving for lunch because if

9

he did not eat, his medications would upset his stomach. [Cheek Depo. at 141].

Plaintiff has submitted sworn statements from Chris Robinson and Reggie Reese, employees of Boral. Robinson is a dyno operator, responsible for sizing the bricks and checking their color. He was working on January 8, 2000, when an employee named Ivory Foster made a mistake in mixing the slurry for a run of bricks. Robinson noticed, after about 3000 bricks had been made, that the bricks were not the right color and immediately told Reggie Reese. Robinson believed the run of bricks would be stopped by Berlingeri once he was told the bricks were the wrong color. He overheard Berlingeri say the slurry mix was short on an ingredient but direct that the run continue. More than 70,000 bricks were run after it was discovered they were the wrong color. [Plaintiff's Exh. 2, Declaration of Chris Robinson].

Reggie Reese, an operator with responsibility for doing the set up for making bricks, was working on January 8, 2000. He recalls that Ivory Foster mixed the slurry incorrectly, resulting in the wrong color for the bricks. Chris Robinson reported the problem to Reese, who verified the mistake then reported it to Berlingeri. Plaintiff was in the area at this time. Berlingeri observed the bricks and stated 50 pounds of silica 86 had been left out. Instead of stopping the run and ordering a change over, which would have taken 20 to 25 minutes, Berlingeri told Reese to continue the run. Reese

10

estimates at least 65,000 more bricks were manufactured with the incorrect mixture. [Plaintiff's Exh. 3, Declaration of Reggie Reese]. Plaintiff states that it later was determined that rather than being short of silica 86, the slurry for that run had the wrong red iron oxide in it. [Cheek Depo. at 146]. Berlingeri denies that he ever had the reported conversation with Reese; instead, he was told about the problem with the brick color the following morning. [Berlingeri Depo. at 67, 69]. If Berlingeri had become aware of the problem with the run of bricks, he should have stopped the run. [Tudor Depo. at 26].

Cheek did not work on January 9. On January 10, 2000, Berlingeri informed Tudor about the mistake with the slurry and the bad run of bricks on January 8. [Berlingeri Depo. at 81-82; Tudor Depo. at 7-8]. Tudor decided he and Berlingeri would talk to plaintiff when he came to work that afternoon. [Tudor Depo. at 8-9]. When plaintiff arrived that afternoon, he met with Tudor and Berlingeri in Tudor's office and asked plaintiff what he knew about the mix-up on the slurry. [Cheek Depo. at 145-46; Berlingeri Depo. at 83-84]. Plaintiff told Berlingeri and Tudor that he looked at the pallet of materials, but that he must have made a mistake. [Tudor Depo. at 9; Berlingeri Depo. at 56, 59, 84]. When confronted about the missing paperwork, plaintiff admitted he had not filled out the slurry control sheet for January 8, 2000. [Cheek Depo. at 145-46; Berlingeri Depo. at 84-85]. At that time, plaintiff did not mention that he was on pain medication, that he stayed in his office due to back pain, that he had

11

surgery scheduled, or that he had spoken with Elliot.  [Berlingeri Depo. at 84-85; Tudor Depo. at 10-11].  Plaintiff was advised that he was suspended pending termination, and that the Atlanta office would decide whether he would be retained.  [Cheek Depo. at 146].

After the meeting with plaintiff, Berlingeri and Tudor discussed the circumstances.  Plaintiff, along with the other Plant 6 supervisors, had been warned in August 1999 about the necessity of paying attention to detail in the brick manufacturing process and in completing paperwork as required.  Plaintiff also had been counseled individually about completing necessary paperwork.  Because plaintiff had been warned before and advised that further failures could result in termination, Tudor and Berlingeri determined plaintiff would be terminated.  [Berlingeri Depo. at 86-87; Tudor Depo. at 13].  Tudor directed Berlingeri to talk to Leonard Gibbs, Vice President of Human Resources, in the Atlanta office about the decision to terminate Cheek.  [Tudor Depo. at 13-14].  Later on January 10, Berlingeri called plaintiff at home to tell him the decision would be communicated to plaintiff on January 12.  [Cheek Depo. at 147].

On January 11, 2000, plaintiff called Tudor to advise that he had been going to the doctor, had been taking pain medication, and had talked with Curtis Elliot on January 4.  [*Id.* at 148-50].  When Berlingeri discussed the decision to terminate plaintiff with Gibbs, Gibbs reviewed and concurred in the decision.  [Gibbs Depo. at 7, 10, 13; Berlingeri Depo. at 93-94].  Berlingeri

never told Gibbs that plaintiff was having problems with his back. [Gibbs Depo. at 17]. In Gibbs' estimation, plaintiff's failure to complete the required paperwork was grounds for termination in light of plaintiff's previous warning from Maner about not filling out paperwork and the warning in August 1999 to all Plant 6 supervisors. [*Id*. at 11-12].

On January 12, 2000, plaintiff reported to work and was advised by Berlingeri that his employment was terminated. [Cheek Depo. at 155-56]. About a week later, plaintiff discussed the termination with Gibbs and told him about his prescription pain medication. [*Id*. at 237].

According to plaintiff, brick runs of an incorrect color had taken place a number of times before. [*Id*. at 187; Maner Depo. at 74-76]. Neither Maner nor Gibbs could recall another employee being disciplined for such a mistake. [Maner Depo. at 77; Gibbs Depo. at 16-17]. In fact, plaintiff recalled an instance when L. C. Eddins, the night shift supervisor at Plant 5, had run the wrong color of brick but had not been terminated. [Cheek Depo. at 188-89].

Defendant avers the incident with L. C. Eddins occurred at Plant 5, which has different paperwork requirements than Plant 6, where plaintiff worked. [*Id*. at 130-31, 132, 189]. Maner has testified that while he has been a manager at Plant 5, no bricks have had to be downgraded because of color attributable to the manufacturing supervisor or slurry control person failing to perform his duties. [Maner Depo. at 84-85]. Further, any problems with incorrect mixtures

13

occurred prior to August 1999, when all supervisors were warned that additional mistakes of that kind would be possible grounds for termination.

While employed at Boral, plaintiff saw posters or a handbook concerning the FMLA. [*Id.* at 221-22]. Under Boral's FMLA policy, an employee must notify his manager of the need for FMLA leave; the Human Resources Department then determines eligibility for FMLA leave. [Gibbs Depo. at 15-16; Berlingeri Depo. at 46-48; Defendant's Exh. 8; Price Depo. at 34-35, 37]. Plaintiff never specifically requested time off for any scheduled surgery or treatment for his back problems.   [Cheek Depo. at 223, 227].   He only mentioned a possibility that he might have to have surgery at some unspecified time in the future. [*Id.* at 222, 223, 227].

## DISCUSSION

This matter is considered by the court pursuant to the provisions of Rule 56, Fed.R.Civ.P. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).  Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to

14

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510.  A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512.  The evidence of

15

the non-movant is to be believed and all justifiable inferences are to be drawn

in his favor. *Id*. at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*,

398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). It is,

therefore, under this standard that the court must determine whether the

plaintiff can meet her burden of coming forward with sufficient evidence as to

each material element of her claim sufficient to permit a reasonable jury to find

in its favor.

The Family and Medical Leave Act provides in 29 U.S.C. § 2612:

(a)(1) Entitlement to leave

Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:

(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

(b) Leave taken intermittently or on reduced leave schedule

(1) In general

Leave under subparagraph (A) or (B) of subsection (a)(1) of this section shall not be taken by an employee intermittently or on a reduced leave

16

> schedule unless the employee and the employer of the employee agree otherwise. Subject to paragraph (2), subsection (e)(2) of this section, and section 2613(b)(5) of this title, leave under subparagraph (C) or (D) of subsection (a)(1) of this section may be taken intermittently or on a reduced leave schedule when medically necessary.   The taking of leave intermittently or on a reduced leave schedule pursuant to this paragraph shall not result in a reduction in the total amount of leave to which the employee is entitled under subsection (a) of this section beyond the amount of leave actually taken.

A "serious health condition" is defined as "an illness, injury, impairment, or

physical or mental condition that involves (A) inpatient care in a hospital,

hospice, or residential medical care facility; or (B) continuing treatment by a

health care provider."  29 U.S.C. § 2611(11).  Title 29 U.S.C. § 2613(b)(6)

requires an employee to provide certification "of the medical necessity for the

intermittent leave . . ., and the expected duration."

Title 29 U.S.C. § 2615 provides, in pertinent part:

> Prohibited acts
> (a) Interference with rights
>  (1) Exercise of rights
>    It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
>    (2) Discrimination
>    It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

To succeed on an interference claim, in which an employee asserts that

his employer denied or otherwise interfered with his substantive rights under

17

the FMLA, "an employee need only demonstrate by a preponderance of the

evidence that he was entitled to the benefit denied. *O'Connor v. PCA Family*

*Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir. 2000); *King v. Preferred*

*Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999)." *Strickland v. Water*

*Works and Sewer Board of the City of Birmingham*, 239 F.3d 1199, 1206-07

(11th Cir. 2001). According to the FMLA regulations regarding interference

claims:

> (a) The FMLA prohibits interference with an employee's
> rights under the law, and with legal proceedings or
> inquiries relating to an employee's rights.     More
> specifically, the law contains the following employee
> protections:
>      (1) An employer is prohibited from interfering
> with, restraining, or denying the exercise of (or
> attempts to exercise) any rights provided by the Act.
>      (2) An employer is prohibited from discharging or
> in any other way discriminating against any person
> (whether or not an employee) for opposing or
> complaining about any unlawful practice under the Act.
>
> \* \* \* \* \*
>
> (b) Any violations of the Act or of these regulations
> constitute interfering with, restraining, or denying the
> exercise of rights provided by the Act. "Interfering
> with" the exercise of an employee's rights would
> include, for example, not only refusing to authorize
> FMLA leave, but discouraging an employee from using
> such leave.

29 C.F.R. § 825.220.

The notice required of intent to take FMLA-qualifying leave is set out in

29 C.F.R. § 825.302:

18

(a) An employee must provide the employer at least 30 days advance notice before FMLA leave is to begin if the need for the leave is foreseeable based on an expected birth, placement for adoption or foster care, or planned medical treatment for a serious health condition of the employee or of a family member.  If 30 days notice is not practicable, such as because of a lack of knowledge of approximately when leave will be required to begin, a change in circumstances, or a medical emergency, notice must be given as soon as practicable. . . .  Whether the leave is to be continuous or is to be taken intermittently or on a reduced schedule basis, notice need only be given one time, but the employee shall advise the employer as soon as practicable if dates of scheduled leave change or are extended, or were initially unknown.

(b) "As soon as practicable" means as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case.  For foreseeable leave where it is not possible to give as much as 30 days notice, "as soon as practicable" ordinarily would mean at least verbal notification to the employer within one or two business days of when the need for leave becomes known to the employee.

(c) An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.  The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed for an expected birth or adoption, for example. The employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken.  In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request medical

19

certification to support the need for such leave (see § 825.305).

(d) An employer may also require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave. For example, an employer may require that written notice set forth the reasons for the requested leave, the anticipated duration of the leave, and the anticipated start of the leave. However, failure to follow such internal employer procedures will not permit an employer to disallow or delay an employee's taking FMLA leave if the employee gives timely verbal or other notice.

(e) When planning medical treatment, the employee must consult with the employer and make a reasonable effort to schedule the leave so as not to disrupt unduly the employer's operations, subject to the approval of the health care provider. Employees are ordinarily expected to consult with their employers prior to the scheduling of treatment in order to work out a treatment schedule which best suits the needs of both the employer and the employee. If an employee who provides notice of the need to take FMLA leave on an intermittent basis for planned medical treatment neglects to consult with the employer to make a reasonable attempt to arrange the schedule of treatments so as not to unduly disrupt the employer's operations, the employer may initiate discussions with the employee and require the employee to attempt to make such arrangements, subject to the approval of the health care provider.

(f) In the case of intermittent leave or leave on a reduced leave schedule which is medically necessary, an employee shall advise the employer, upon request, of the reasons why the intermittent/reduced leave schedule is necessary and of the schedule for treatment, if applicable. The employee and employer shall attempt to work out a schedule which meets the employee's needs without unduly disrupting the

20

employer's operations, subject to the approval of the
health care provider.

(g) An employer may waive employees' FMLA notice
requirements.   In addition, an employer may not
require compliance with stricter FMLA notice
requirements where the provisions of a collective
bargaining agreement, State law, or applicable leave
plan allow less advance notice to the employer.  For
example, if an employee (or employer) elects to
substitute paid vacation leave for unpaid FMLA leave
(see § 825.207), and the employer's paid vacation
leave plan imposes no prior notification requirements
for taking such vacation leave, no advance notice may
be required for the FMLA leave taken in these
circumstances.   On the other hand, FMLA notice
requirements would apply to a period of unpaid FMLA
leave, unless the employer imposes lesser notice
requirements on employees taking leave without pay.

## Counts I and II - Denial of FMLA Leave

Count I of plaintiff's complaint alleges that defendant denied him 12

weeks of unpaid leave under the FMLA for a serious medical condition.  Count

II alleges defendant denied him intermittent leave under the FMLA for

treatment visits to medical care providers.

The FMLA allows an employee a total of 12 weeks of leave "because of a

serious health condition that makes the employee unable to perform the

functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).

Defendant contends plaintiff cannot succeed on Count I because plaintiff never

had any need to be off work for any planned medical treatment and never

21

scheduled or required any surgery for which FMLA leave would have been available. It also is argued that plaintiff never gave the appropriate 30-day notice required under 29 U.S.C. § 2612(e)(2) and 29 C.F.R. § 825.302(a).

The record evidence shows that plaintiff initially received treatment for his back injury on January 8, 1999. He did not request time off for that treatment, nor did he miss any work. The next time plaintiff's back caused him to seek medical treatment was December 27, 1999. There is no evidence that he requested or was denied time off to obtain treatment. Plaintiff was at work the following day and the remainder of that week, and there is no evidence he sought to take time off.

Plaintiff's back pain again caused him to seek medical care on December 31, 1999, or January 1, 2000, and he received medication. Again, plaintiff was not denied any requested time off to receive that treatment. Plaintiff also was not denied time off to see Dr. Martin Jones on January 4, 2000, and he voluntarily came into work after his appointment. Dr. Jones placed no work restrictions on plaintiff. Curtis Elliot allowed plaintiff to stay in the office rather than on the floor after plaintiff advised him that he was in some pain and was taking pain medication which could affect his ability to work. January 4 was the first time plaintiff mentioned that he might have to have back surgery or a spinal block. There is no evidence that Elliot made any negative comment to plaintiff or in any way tried to discourage plaintiff from

22

having any surgery he might need.  Further, at that time, plaintiff was not giving notice of any actual surgery that was needed; he only said it might be required at some point in the future. The court finds that the evidence does not establish any denial of FMLA rights for the time period up to and including January 4, 2000.

Plaintiff relies primarily on the alleged remarks of Jose Berlingeri to support his claim that defendant interfered with his FMLA rights.[1]  On January 5, 2000, plaintiff and Berlingeri discussed the possibility that plaintiff might have to take time off for back surgery.  Berlingeri told plaintiff to let him know if surgery had to be scheduled so that Berlingeri could arrange for someone to perform plaintiff's duties while he was out.  He also cautioned plaintiff that the surgery could worsen the problem rather than ameliorate it. Plaintiff characterizes Berlingeri's comments as "discouraging" him from taking time off to receive medical treatment.  He also says he felt Berlingeri was "disgruntled" about the prospect of plaintiff missing work.  The court finds that Berlingeri's comments or actions do not constitute a denial of plaintiff's FMLA rights. At the time plaintiff spoke with Berlingeri, he was not asking for FMLA leave; he was only mentioning the possibility that he might request leave in the future.  Berlingeri only asked for plaintiff to give him enough notice if surgery

---

[1] Berlingeri testified that he and plaintiff spoke generally about plaintiff's back injury and the fact he might have to have surgery in the future, but he denied having said plaintiff was too young for back surgery. [Berlingeri Depo at 64-65]. The court will assume for purposes of the summary judgment motion that Berlingeri did make such comments.

23

was required so that Berlingeri could ensure that plaintiff's duties would be covered by someone. Berlingeri did not object to plaintiff taking any leave, and plaintiff's subjective feeling that Berlingeri was "disgruntled" does not support a finding that plaintiff was denied FMLA leave. Further, it is not a reasonable inference that Berlingeri's remarks about the advisability of back surgery were meant to prevent plaintiff from having the surgery for reasons prohibited by the FMLA.

There are few reported cases involving plaintiffs alleging they were discouraged from taking FMLA leave. However, a review of those cases bears out the conclusion that Berlingeri's remarks that the surgery might not succeed were not meant to prevent plaintiff from having the surgery for reasons prohibited by the FMLA. In *Williams v. Shenango, Inc.*, 986 F.Supp. 309, 320-21 (W.D.Pa. 1997), the court found summary judgment inappropriate because a jury could find that the defendant discouraged the plaintiff from taking FMLA leave when it denied his initial request for leave and suggested he ask for leave for a different week, and when it did not provide the employee with assurances that his leave would be considered FMLA leave. The court in *Mora v. Chem-Tronics, Inc.*, 16 F.Supp.2d 1192 (S.D.Cal. 1998), found that if the employee was aware that his employer had decided not to accept any more medical notes or excuse any further absences of the plaintiff to care for his terminally-ill son, his FMLA rights were violated.

24

In *Mardis v. Central National Bank & Trust of Enid*, 1999 WL 218903 (10th Cir. Apr. 15, 1999), the court stated an employer would be found to have discouraged its employee from taking FMLA leave if it informed her that she would be deprived of all accrued sick and annual leave as a condition of taking FMLA leave. In *Goodwin-Haulmark v. Menninger Clinic, Inc.*, 76 F.Supp.2d 1235 (D.Kan. 1999), an employer discouraged an employee from seeking FMLA leave by forcing her to choose between resignation or working without leave.

When the plaintiff was asked to delay his request for FMLA leave until a later date but did not, and the employer denied the request for leave, the court concluded summary judgment should be denied because a jury could conclude the request for delay "chilled" the plaintiff's assertion of his FMLA rights and that the plaintiff's refusal to delay his request contributed to its ultimate denial. *Shtab v. Greate Bay Hotel and Casino, Inc.*, 173 F.Supp.2d 255(D.N.J. 2001). In *Burch v. WDAS AM/FM*, 2002 WL 1471703 (E.D.Pa. June 28, 2002), the court held that the plaintiff was not "discouraged" from taking FMLA leave because his supervisor periodically reminded him about overdue reports and other matters required of him in the ordinary course of his job.

Essentially, these cases all point to a conclusion that, in order to constitute discouragement within the meaning of the FMLA regulations, an employer must impose a strong disincentive against an employee taking FMLA leave. Berlingeri's remarks to plaintiff simply do not rise to the level of

disincentive exhibited in the cases in which an employer was found to have discouraged an employee. Nor do the comments even create an issue for jury determination as to whether plaintiff was discouraged from applying for FMLA leave. Plaintiff was not told he had to schedule surgery for a particular time; he was not told he could not take leave; he was not told he would have to forfeit sick or annual leave in order to take FMLA leave. Instead, Berlingeri only asked plaintiff to advise him whenever he scheduled surgery so that someone could take over plaintiff's duties in the interim. As plant manager, it was not unusual or unreasonable for Berlingeri to make such a request.

Cheek also told Berlingeri that he might be late for work on January 7, due to the scheduled MRI. Berlingeri did not express any problem with plaintiff's possible lateness but told plaintiff that would be fine. Therefore, plaintiff was not denied FMLA leave in this instance, either. Plaintiff also was allowed to leave early for lunch on January 8 so his medications would not be taken on an empty stomach.

Defendant also contends it is entitled to summary judgment on Count II because plaintiff never requested intermittent leave and because plaintiff did not establish that such leave was "medically necessary" within the meaning of 29 U.S.C. § 2613(b)(6). As discussed above, plaintiff never actually requested FMLA leave on any occasion. He only mentioned the possibility such leave might have to be taken in the future. Further, plaintiff's visits to a doctor or

26

emergency room up to the date of his termination took place when he was not scheduled for work, or he was allowed time off for such appointments.  On the date of his MRI, his supervisor approved plaintiff's delayed reporting for work. Therefore, summary judgment also is appropriate on this count.

## Retaliation

For a retaliation claim, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the FMLA, "an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right."  *Strickland*, 239 F.3d at 1207.  A plaintiff claiming retaliation must meet "the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus."  *Id.* (internal quotations omitted).

When evaluating a claim of retaliation under the FMLA, in the absence of direct evidence of discrimination on the part of the employer, courts apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for evaluating Title VII retaliatory discharge claims.  *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).

27

A *prima facie* case of retaliation is established if the plaintiff shows that (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action. *Id.* The inquiry on the third factor is "could a jury reasonably find from the evidence presented at the summary judgment stage that [the plaintiff] was fired because [he] sought FMLA leave?" *Id.* To establish the causal connection element, "a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.'" *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (quoting *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985)). In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997). Proximity in time of protected conduct and adverse employment action also may create a factual issue as to causation. *Brungart*, 231 F.3d at 799.

Once a plaintiff establishes a *prima facie* case under the *McDonnell Douglas* framework, the burden of production shifts to the employer to articulate a legitimate reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Department of Community*

28

*Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). To satisfy that burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it" discharged the plaintiff for attempting to exercise his FMLA rights. *Burdine*, 450 U.S. at 254-55, 101 S.Ct. at 1094 (citation and footnote omitted).

If a defendant carries its burden of producing legitimate, nondiscriminatory reasons for its decision, the presumption of discrimination created by the *McDonnell Douglas* framework "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255 & n.10, 101 S.Ct. at 1094-95 & n.10. However, the trier of fact still may consider evidence previously introduced to establish a *prima facie* case. *Id.* at 255 n.10, 101 S.Ct. at 1095 n.10. The plaintiff's initial evidence and any inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. *Id.* At this stage in the inquiry, the plaintiff has an opportunity to demonstrate that the proffered reason was not the true reason for the adverse employment action. A plaintiff may directly persuade the court that an improper motive more likely underlay the discharge or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Id.* at 256, 101 S.Ct. at 1095. *See also Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997)

(discussing application of *McDonnell Douglas* framework and evidence at each stage).

In plaintiff's case, while Berlingeri was aware that plaintiff <u>might</u> request leave at some time in the future for back surgery, at the time of his discharge plaintiff had not asked for FMLA leave. Further, any back surgery or spinal block was only a vague possibility; it was not settled that plaintiff indeed would have to undergo surgery. The mere mention of a possible need for surgery at some time in the future is not enough to constitute the assertion of FMLA rights and so cannot be "protected conduct." Mere awareness by defendant that plaintiff <u>might</u> be requesting FMLA leave at some indefinite time in the future is insufficient to satisfy that element of a *prima facie* case.

Defendant has cited *Harnisch v. Aeroquip Inoac Co.*, 2000 WL 33121898 (N.D.Ohio Oct. 12, 2000), for the proposition that plaintiff's statement that he might need surgery in the future is insufficient to serve as "protected expression." In that case, the employee's statement, "I don't know, nobody can see the future," in response to an inquiry whether plaintiff's daughter might need future hospitalization or care, was held to be insufficient evidence of a causal connection between the plaintiff's future FMLA absences and her termination. In *Morehardt v. Spirit Airlines, Inc.*, 174 F.Supp.2d 1272 (M.D.Fla. 2001), the court described "protected activity" under the FMLA as meaning "that the leave <u>he has taken, or requests to take,</u> must be leave that he is

30

eligible for and is entitled to take under the Act." *Id.* at 1281 (emphasis added). In this case, plaintiff neither took FMLA leave nor requested to take FMLA leave; therefore, there was no protected conduct.

Even if the court were to find that plaintiff engaged in statutorily protected conduct, that does not require denial of summary judgment to defendant.     Plaintiff was discharged; therefore, he suffered an adverse employment action.    With respect to the element of a causal connection between the protected conduct and the adverse employment action, plaintiff has shown that the ultimate decision maker, Berlingeri, knew plaintiff might need back surgery.[2]  The record also shows that plaintiff was terminated within a week after Berlingeri became aware that plaintiff was suffering from back problems that his doctor had said might have to be addressed by surgery. Under these circumstances, the court concludes that plaintiff has raised a sufficient question regarding causal connection.

Defendant has proferred a legitimate reason for plaintiff's termination: that he failed to review and sign off on a slurry control sheet, thus resulting in a large run of bricks of an incorrect color.  Further, this omission occurred only a few months after Boral Plant 6 supervisors had been warned that incorrect

---

[2] Berlingeri initially decided that plaintiff should be terminated.  He discussed the decision with Tudor, but Tudor states that he (Tudor) did not make the decision; he only concurred in it. [Tudor Depo. at 7]. Berlingeri also discussed the decision with Gibbs, who did not make the decision to fire plaintiff but also concurred in it. [Gibbs Depo. at 10-13]. At the time Tudor and Gibbs agreed that plaintiff should be terminated for the failure to perform his duties, they were unaware that plaintiff had back problems. [Tudor Depo. at 10; Gibbs Depo. at 12].

31

mixtures could be grounds for termination and after plaintiff previously had been counseled about his paperwork.  Therefore, defendant has satisfied its burden of production, once again shifting the burden to plaintiff to show that defendant's reason was a pretext for firing him because it feared he would to take FMLA leave.

In attempting to demonstrate that a genuine issue of material facts exists as to whether defendant's reason was pretextual, plaintiff points to what he claims is evidence of disparate discipline.  The court does not find that the evidence as to L.C. Eddins shows that plaintiff was disciplined in a disparate manner for allowing the wrong color of bricks to be run.  While plaintiff avers there were many bad runs without disciplinary action taken against the supervisor, he has not offered any evidence to support this claim, other than L.C. Eddins.  Further, the incident with Eddins occurred before the increased emphasis on quality control and in another plant.  Therefore, he is not a proper comparator.

Plaintiff points to Berlingeri's statements that plaintiff was too young for back surgery and that the surgery might make his condition worse.  He also refers to the declarations of Chris Robinson and Reggie Reese regarding the run of bricks that led to plaintiff's termination.  The evidence is in dispute as to whether Berlingeri knew the run of bricks was bad but allowed it to continue.  While Robinson and Reese maintain that Berlingeri was aware of the mistake

after 3000 bricks but told them to continue, Berlingeri denies he knew until the following day when the run already was completed.  Ultimately, this dispute does not compel denial of summary judgment because it is not material.

It is not in dispute that plaintiff previously had been counseled about completing his paperwork properly and that Plant 6 supervisors and managers, including plaintiff, had been warned that additional bad runs would be cause for termination.  It is not in dispute that Tudor and Gibbs considered plaintiff's failure to do the necessary checks and paperwork on January 8, causing a large run of bricks of the wrong color, as sufficient grounds for termination.  Reese's declaration states that Berlingeri believed some of one component, silica 86, had been omitted from the slurry, but it turned out that another component, red iron oxide, was completely incorrect.   The bricks thus had to be downgraded.  An inference may be drawn that Berlingeri may have been concerned that he would be terminated for making the wrong call on stopping the run; therefore, he allowed plaintiff to be the scapegoat.  However, the evidence does not support a reasonable inference that Berlingeri sought plaintiff's termination because plaintiff might have to take leave at some time in the future.  The "connection" between plaintiff's possible surgery at some unspecified time in the future and his termination is simply too tenuous.  Instead, plaintiff has failed to present enough evidence to raise a genuine issue of material fact to rebut defendant's preferred reason for his termination.

33

A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this __27th__ day of March, 2003.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE